May it please the court, Nicholas R. Gwimbau. We would like to split this up between me and co-counsel Katherine Hart. We'd like to reserve 10 minutes. Just watch the clock. When you say you're splitting it with co-counsel, roughly how many minutes for you? How many minutes for Ms. Hart? I think roughly 5.15. 5.15, okay. Well, I'll help you, but you control the time. We'll be discussing three issues. I would like to discuss the diminished capacity for heroin use and ineffective assistance in that respect, and the life without possibility of parole issues. Which are claims 33 and 42. Ms. Hart will discuss ineffective assistance for failure to bring in mitigating evidence at the penalty phase. With respect to the diminished capacity issue for failure to introduce evidence of intoxication and heroin use, this goes to the guilt, special circumstances, and penalty. As you'll recall, the 1977 statute is unique in that it has a premeditation requirement for special circumstances. The main issue here is whether or not Mr. Stankiewicz's lawyer can be held, permitted to rely upon his defendant who ostensibly objected to a diminished capacity defense. The difficulty here is probably unique to this case, I hope it is unique to this case, that the lawyer and the client, the lawyer agreed that he did not think that the client understood the defense. The defendant, in fact, said what his version was. Quote, my version, you know, what it means, you are saying guilty, but this guy is sorry or something. And that ain't no defense. Well, diminished capacity, of course, is not saying you're guilty. Nor is it necessarily saying you concede the actus reus. It is in any event, whatever it is, if you tell your lawyer I'm opposed to the diminished capacity defense and then say what you think that is, that doesn't oblige the lawyer to do anything more than not present what you said it was. That seems to me pretty clear. And there is no indication on the record that Mr. Goodwin had been told by his client anything other than what it means, you are saying guilty, but this guy is sorry or something. Now, how do we test this particular issue? What's the controlling jurisprudence? Are you relying on any particular case? As to this particular issue, as far as I know, there is no particular case. That is, with respect to whether the lawyer, in the context of an ineffective assistance claim, can rely on a client that is not a defendant. Who he considers to be incompetent, a client who clearly, whether he's legally incompetent or not, does not know the meaning of the defense. The ultimate case here, of course, is Strickland, which is pretty well developed, and we don't need to go beyond Strickland to make it clear that a lawyer who is supposed to make reasonable decisions can't rely on a defendant who doesn't know what he's talking about. Be that as it may, it's clear that there's no waiver of a defense when you don't know what the defense is. Also, there's nothing on the record that says that Mr. Stankiewicz waived diminished capacity, either as to special circumstances or as to penalty. Under Strickland analysis, assuming he was ineffective, we'd still have to find that it prejudiced him, so how would you argue prejudice against the evidence which suggests that he did have the capacity, even if it had shown that he was on heroin? Well, what we have here is a prior expert who said that he would have seen an issue of diminished capacity as to premeditation if he had known, if there had been evidence of heroin use. We have two experts who say that you can't premeditate under the circumstances of this case, that is, somebody having nearly overdosed on heroin approximately 20 minutes prior to the offense. We have the lead witness for the prosecution saying that Stankiewicz went into the Olympic Hotel in Fresno for, quote, three bags of heroin, saying that at the preliminary hearing, not saying it at the trial. We have Tina Topping saying that she shot him up approximately 20 minutes before, and we have somebody saying how long it takes to drive between the two places. So everything is pretty well lined up there, and if you decide that there's an inadequate showing of prejudice, the appropriate thing to do when there is a showing of that degree is to send it back for an evidentiary hearing, not to throw it out. With respect to claims 33 and 42, the life without parole issues, which are, have been pleaded as partly an issue of an instructional error and partly an issue of juror misconduct. I'm reminded of Justice Blackmun when he said he wasn't going to tinker anymore with the death penalty system. Here is a situation where if it warrants anyone's tinkering, this is it, because repeatedly, and the facts are probably better developed in this case than in almost any other. Repeatedly, California juries have felt that the only safe way to prevent a dangerous man from getting out again is to give him the death penalty. In fact, it's just about the reverse, because if somebody has life without possibility of parole, they get an appeal to the State District Court of Appeal. They do not get a habeas because it isn't paid for. They do not go to federal court because that isn't paid for. They ordinarily do not get a petition for certiorari, whereas the person convicted of the death penalty gets a whole lot more besides that, gets a habeas in state court, a habeas in federal court, gets an appeal to this circuit. And so forth. And... Counsel, on this particular point, what troubles me is that what the judge actually said was not an erroneous statement of the law, was it? He may not have answered it in the way you might have if you were presiding, but how do we find legal error there? Well, we find legal error because of the question of the jury, which was very clearly an indication that they thought that a man in Stankiewicz's position might be paroled. But what if the answer had been what the statute or what the instruction later came? What if he had gone on to say and talked about clemency? How would that have cut? Well, what he clearly needs to tell them when there's a question like that is you are required to assume that if you give the person life without parole, they will never be paroled. They will be in for life, period. That life without parole means life without parole. Juries, for one reason or another, see it differently from that. And... Are you saying then, I realize this issue isn't before... Well, so that's what you would not have... I'm sorry. Let me back it up. If he had done or said what the subsequent instruction now says apparently, that there is, acknowledges there's the fact of clemency by the government, if that had been included, do you think that would have been error as well, to have just said that? Probably yes, because that's not for their consideration. Their consideration is... What is the effect of our decision? And the effect of their decision from their point of view must be life without parole means life without parole. And not get into the slippery slope of other ways that you might get out. Thank you. Okay. Thank you, counsel. Ms. Hart? May it please the Court. My name is Catherine Hart. And I was appointed as second counsel at the district court level to assist Mr. Argenbaugh in preparing for the evidentiary hearing. The evidentiary hearing, which Judge Ishii later said was improvidently granted. I'd like to concentrate on the issue of ineffective assistance of counsel at the penalty phase. The dearth, the paucity of mitigation evidence presented at the penalty phase in this case is appalling, appalling in light of what was available to Mr. Hugh Goodwin at the time. And appalling in light of what we have been able to prepare in the form of the various declarations before the court. Investigation in this case has shown that Mr. Stankiewicz had severe brain damage. The Exhibit 47 declaration of Nell Riley, a clinical neuropsychologist who administered a particular psychological test, among others the Halstead-Wrighton test to Mr. Stankiewicz, found that of 10,000 people given the test, he scored third from the bottom in a third-from-the-bottom percentile, showing significant dysfunction, severe brain damage, borderline retarded, IQ of about 79. Nothing like that was ever presented at the jury trial. He has dyslexia and is the product of physical abuse and alcohol abuse. Dr. Rosenthal and his declarations are at the excerpt of Record 26 and 96, a psychiatrist. Dr. Rosenthal looked at the records from Napa State Hospital. Now, I know Mr. Goodwin presented evidence through Joe Walden, a probation officer, that Mr. Stankiewicz went to Napa Hospital at the age of 6. But there was nothing in the record about the precursor biographical information, the life history that the Wiggins v. Smith case, U.S. Supreme Court case at 123 Supreme Court 2527, seems to demand. Information about Mr. Stankiewicz is that when he was in utero, his mother, and we know that from the declaration of Marion Stankiewicz, who was available at the time of trial to testify, Marion Stankiewicz admitted that she drank, drank copiously, drank huge amounts. Now, did Mr. Goodwin present any of this? No. He presented information at the penalty phase through a woman named Teresa Montgomery that Native Americans drank a lot on the reservation. Well, that just kind of feeds into every truism and every cliché that most Americans probably have about Native Americans is they drink a lot. Well, what happens when a mother drinks a lot and drinks, by her own admission, one or two-fifths two times a week and causes this child in utero to develop, according to Dr. Rosenthal and according to Dr. Nell Riley, fetal alcohol syndrome? Now, not only was Mr. Stankiewicz raised in an environment where his mother was drinking huge amounts of alcohol, but at the time he was six years old, he was severely beaten, but it wasn't just one incident of beating, as Joe Walden talked about, the probation officer who never saw Mr. Stankiewicz after the age of six, that the beating caused brain damage, according to Dr. Rosenthal, that there's some type of indentation in Mr. Stankiewicz's cranium. When he went to Napa State Hospital, this wasn't just a little boy going to a hospital. This was a boy going to a state hospital at age six where he was found to be so intractable he was injected with doses of Thorazine.   himself did not want it presented. Why wasn't this presented to the jury? I know I probably sound rather emotional. In respect to the question of why was it not presented, obviously part of the reason, at least, and I'd like you to help us with what the record actually says, but part of the reason appears to be that the defendant himself did not want it presented. How substantiated is that? Well, the defendant did not want a diminished capacity defense presented, and the defendant apparently did not want to have his family members called. That's the information we have. We don't really have information that the defendant frustrated the whole presentation of a penalty phase. Moreover, even if a defendant does frustrate the presentation of family evidence, the Court's ruling in Douglas v. Woodford at 316 F. 3rd 1079, Ninth Circuit case, involved a case where the defendant in that case, the petitioner, Douglas, was not forthcoming and was resistant to presentation of mitigating evidence, and the Court held that that did not excuse the attorney from investigating all available mitigating evidence. Counsel, if we were convinced that Mr. Stankiewicz did not want a diminished capacity defense, would the question of diminished capacity only go to the guilt phase or does it also go to the penalty phase? The diminished capacity would go to the guilt and the penalty phase as well. Mr. Argenbaugh has certainly argued that there was a failure to put on a diminished intent defense. So diminished intent that Mr. Stankiewicz did not want to have at the guilt phase, but there isn't really any evidence that he resisted any type of diminished intent defense at the penalty phase. Diminished intent at the penalty phase could have been used for a different purpose, and certainly the psychiatrist would not just have testified in a penalty phase had they been called to diminished intent. They would have talked about basic organic brain damage. If you adopted a diminished capacity defense at the guilt phase, ordinarily then would the defendant be conceding the act? So it would not be sort of a not guilty by reason of the fact that I didn't shoot Teresa. It would be I shot her, but I did so because I was in a drug-induced and alcohol-induced  Of course the defendant would be conceding the act. But Mr. Stankiewicz, with organic brain damage and with the mild, not profound, but mild mental retardation, might certainly have had some difficulty in trying to disentangle that whole notion that you're not you did the crime, but you're not guilty of the charged offense. You're not you may not be guilty of first-degree murder. You may be guilty of second-degree murder. You may be guilty of manslaughter. Yes, you're right. You certainly have committed the actual act. But I don't see any evidence that Mr. Stankiewicz thwarted Hugh Goodwin in presenting a penalty phase. In fact, there is one point that, in spite of all the lancy briefing that's been pointed out, there's one point that has not been brought to this Court's attention, and that is in the supplemental excerpt of record that Respondents applied. And it's supplemental excerpt of record item 20. Right there, Hugh Goodwin, who is filing a motion before the Fresno Superior Court and is requesting a continuance of the trial, is stating that he needs to bring in Dr. Melgus, a psychiatrist, as an indispensable witness at the trial. And Hugh Goodwin's declaration under penalty of perjury, this was approximately, let's see, March or April of 1983, months before the case was actually tried. Hugh Goodwin says Dr. Melgus, a psychiatrist, is an indispensable witness and that he, Hugh Goodwin, would be severely handicapped if Dr. Melgus were not brought in. Now, the importance of that is that Dr. Melgus did testify at the first 1978 trial. Dr. Melgus was a CYA psychiatrist who treated Douglas Stankiewicz at CYA in 1973 and 1974 and had an opinion that the severe abuse of the ‑‑ of Douglas Stankiewicz as a child caused him problems and that his being shunted from foster home to the hospital and foster home caused him to have problems so that he was only very present‑oriented and did not deliberate and did not think things out. Now, there's nothing in the record as to why Hugh Goodwin never brought this witness that Hugh Goodwin considered to be an indispensable and vital witness that who would ‑‑ whose absence would severely handicap the case, but I think that that is certainly some indication that Hugh Goodwin was ‑‑ started to do some development of the penalty phase and then for whatever reason was totally indifferent to the remainder of it. Unfortunately, we ‑‑ you know, he's not in a position, he's had some type of stroke and we can't obtain his testimony. Does the record reflect whether Mr. Goodwin actually spoke with Dr. Melgus? No, because the doctor has a declaration saying that to his knowledge he was never contacted by Hugh Goodwin. There was some indication that the doctor had had some ‑‑ With respect to the second trial? With respect to the second trial, he says yes. Dr. Melgus says that he was ‑‑ he had no recollection of being contacted. So we're left with ‑‑ we don't know why Hugh Goodwin said that he was an indispensable witness and Dr. Melgus says he was never contacted. It could have been that, you know, his secretary or staff was contacted and Hugh Goodwin was informed there was a liver transplant or something. I mean, we don't ‑‑ I can't ‑‑ I can't answer that because there is no further information in the record. But we do know that this psychiatrist would have testified to the effects of child abuse and we do know that that's one of the very important prongs in the Wiggins case. Well, before, just so I can make sure I understand the linkage or delinkage between the diminished capacity, it's not inconsistent to resist a diminished capacity defense at the guilt phase, but having lost on the jury verdict of having committed the crime, he could still present evidence of all of this mental retardation and disability at the penalty phase in mitigation and apparently also do so, according to what I gather you're saying, without necessarily calling any of the family members as witnesses. Is that the thrust of what you're saying? That's correct. Because if Mr. Stankiewicz were vehemently opposed to calling family members, then certainly the information from family members could have been used by a psychiatrist or a psychologist. But the thing about the mitigation is, yes, the mitigation would not necessarily go to diminished capacity. It would go to simply the life history that the Wiggins v. Smith and the Williams v. Taylor cases have found by the U.S. Supreme Court and also by many cases in your Court to be crucially important in evaluating a person's life. And consider the state will argue that those cases are distinguishable here. I'll let them make the argument, but just so I can hear your reaction. Oh, the state will make the argument that in the Williams v. Taylor case that Mr. Stankiewicz is so much worse, the state may make the argument in the Wiggins v. Smith case that the Wiggins case involves somebody who had little or no history of prior violence, and Mr. Stankiewicz did have an extensive history. I was going to focus more on the nature of what Mr. Goodwin actually presented and did. Well, what Mr. Goodwin actually presented and did was a very sketchy outline. But more than was done in either the Williams or Wiggins cases. Well, I wouldn't say that it was more than, because certainly we had in the Wiggins case, I think, or excuse me, in the Taylor case, there was a psychologist who provided information. There was a penalty phase that consisted of a couple of family members and a psychologist who provided no background information, nothing about mild mental retardation or significant childhood abuse. I would submit that they're probably very similar. In this case, we had one, Teresa Montgomery, who said Native Americans on reservations drink and live in poverty without much correlation with Stankiewicz. We had Joe Walden, the probation officer, who sketched the very vague outlines of Stankiewicz's life but did not give anything about fetal alcohol syndrome. You know how I compare it? Counsel, I'm just pointing that you're down to about four minutes. You may want to reserve for your side. Oh, okay. Let me just sum it up. Hugh Goodwin gave an impressionistic sketch of Stankiewicz's life. Impressionism in art is great, but when we are talking about saving somebody's life, we don't want a French impressionist sketch of, you know, water lilies. We want something that is a detailed, filled-in panorama of somebody's life history. Thank you. Thank you, counsel. We'll hear from the State. May it please the Court. I'm John McLean, Deputy Attorney General. Your Honors, my intention this morning is to spend the bulk of my time addressing the claim of ineffective assistance to counsel in the mitigation phase. Of course, there have been a number of Supreme Court decisions, decisions of this Court, touching on this issue. Well, the one that I want to hear about is Wiggins. Arguably, Wiggins would mandate at least an evidentiary hearing under these circumstances. Your Honor, what makes this case unique, and it makes it unlike any of the recent cases, is that it involves a second trial. The defendant had been found guilty at the first trial. He had been sentenced to death. A diminished-capacity defense had been presented. A panoply of mental experts had been presented. The defendant had been sentenced to death. And the case had been reversed based solely on issues related to whether a competency hearing should have been held or there should have been some substitution of counsel. So the actions of the first trial would have complied with Wiggins? What I'm saying, Your Honor, is that in assessing ineffective assistance of counsel at the second trial and viewing the actions of counsel at the second trial, it has to be viewed through the prism of someone who's walking in knowing they've got an extremely – there's no doubt this person has an extremely difficult job. Why wouldn't that put more pressure on them to do an even greater and more in-depth investigation? It certainly would put pressure on, but what it wouldn't do is make a difficult case – wouldn't make a difficult case easier. I'm not sure I follow that. If you're – I mean, Judge Scanlon focused on Wiggins, okay? So your response to that was, well, we distinguish it because this is a second trial. If anything, it would show that he's gone through it once and been convicted and sentenced to death. That seems to me that that would put attorney number two – I'll posit this. Attorney number two gets the benefit of reading through the first trial and looking at what he might do better, okay? If I'm looking at a trial where I think maybe I'll probably lose on the guilt phase, I better focus heavily on whatever I can come up with to keep them away from I have to say, it's a little in light of Wiggins. It's kind of hard to say that this fellow did what would comply with Wiggins. It's certainly arguable. So why is it that – what is it about the first trial that sort of made his burden lighter as a matter of law? Two things, Your Honor. And I would look at it first from the – basically look at it through the two prongs of Strickland. Deficiency and prejudice. And, of course, the district court in this case ruled based on the prejudice prong and did not address the deficiency prong. So – but I'm very happy to address the deficiency prong because much of the time we were going through the district court, there was this assertion that counsel had not obtained and not read any of the records from the first trial. And we pointed out in our response that during this period while we were preparing for evidentiary hearing, it was determined that, in fact, there were these declarations under penalty of perjury. Okay. So let's assume that he – Let's assume he – Yeah. Okay. And I'm happy to proceed from that assumption. We've got a couple of experts from the first trial. And from – and those – what did those experts at the first trial say? There were a number of experts. And essentially they said, and the district court pointed this out, one of the harms of bringing these experts is these experts at the first trial essentially came to the conclusion that the defendant was a sociopath, that he was callous, had no regard for others, and there was a very good reason not to bring in – not to bring in experts. Even assuming you bring in some new experts who may have differing views, that is certainly going to open up expert testimony saying, no, this is not a defendant with a schizoactive disorder, as the experts, the new experts on habeas have suggested. But, see, counsel, the problem with that is that the Supreme Court has said, before an attorney can make strategic tactical decisions like that, he's got to do an adequate investigation to know what he's dealing with. And you're saying, well, he read the transcripts and he's got these experts who say he's a sociopath. Okay, so it seems to me that the lesson one takes from the Supreme Court in both that and the Williams case is that they want, at least in the penalty phase, where the dynamic is different. The guy's been convicted. Now you're looking to see whether there's anything that's going to cause the jury to try and understand how somebody who's committed gross, extreme, terrible crimes has any redeeming virtue that might appeal to the jury. And if at the end of the process, as you're suggesting, he says, look, if I put on these witnesses, these experts that the defense has now come up with, why, I mean, I'm going to get clobbered with counter-evidence and makes that conscious decision. Where's the evidence that he did any of that? The evidence is, Your Honor, that first trial has an extensive amount of testimony about the defendant's social history, his upbringing through the foster care, his stay at Napa Hospital, the juvenile court, CYA. Counsel had access to all of that information. This isn't like Wiggins. This isn't like the other cases. This attorney had not only access and knowledge of all that information, he had a bunch of experts who had assessed this defendant in a way that was not very favorable. And there were a number of reasons not to want to present that mental health testimony. As I say, he could have been countered and would have been countered by testimony that he was a sociopath. Let's take the example of the counsel side of Dr. Melgis, who counsel tells us would have testified that he had trauma to the head and so forth. Can you tell us here that not even speaking to Dr. Melgis is a strategic decision on the part of counsel? Well, we don't know if he did speak to Dr. Melgis. What we do know is Dr. Melgis' testimony in the first trial so infirm that there was no reason for him to speak to him before the second, even talk to him. Can you restate that, Your Honor? Well, yeah. I'm trying to figure out whether counsel satisfied his duty of investigation. Then there's sort of the second question as to whether he's made a good judgment about what to present or not to present. But if he's failed to speak to witnesses and it appears that Dr. Melgis would have given testimony that might have been the kind of testimony that you would expect to see in mitigation at a penalty phase, but he hasn't even spoken to him. Well, Your Honor, we don't know if he spoke to him. We don't know if he spoke to him or not. Dr. Melgis said he didn't have any recollection of that. He may have had no recollection of that. This case is now 25 years old. But what we do know is that he had seen the testimony and the records at minimum. Okay. At minimum. Dr. Melgis' testimony in the first trial, is it reasonable? Let's assume that he did speak to him, so he sort of satisfied his bare duty of investigation. Is there a strategic reason for not calling Dr. Melgis? There's a strategic reason for not calling any mental experts, and that is that it is going to – the mental experts are going to testify, at least in large part – again, we're at the second trial. He's been found guilty the first time. A diminished capacity defense has been presented. It has failed. And mental health experts testified at that first trial that he is a sociopath. And we're better off at the second trial not putting anybody on? Or just putting on some fairly sketchy folks? I think you're better off not putting on experts when they are going to – The district court, I would point out, found that the experts that Petitioner has presented in this habeas proceeding, in their final order, they found that those experts were – they found that they did not undermine – that their findings were not supported by the record, that they did not undermine the findings of the experts who were able to examine the defendant much closer in time to the trial, not many years after like these experts did. And so I think that any credibility given to the new experts has to be certainly viewed in that light, in light of the fact – in light of whether those findings by the district court were – Isn't that always going to be the case where you're – I'm sure in the – in fact, the record I think does show in the Supreme Court cases that there were experts who were called in long after the trial, I mean, by nature of events. So you're always going to have, in an ineffective assistance, where there was inadequate investigation, the experts who are going to – that the defendant is able to come up with to show that are always going to be much later in time. So how much weight would one give that? Certainly. No, but I – but the fact that it is much later in time is a factor to be considered. And this Court has in one of its recent – in one of its recent opinions has used that same factor, that it's many years after. So fetal alcohol syndrome, you know, occurred after or the manifestation of it would have occurred after all of these events? Is that what you're suggesting? All I'm saying, Your Honor, is that the district court did not believe that the findings of these experts were supported by the record and that – and that one of the reasons is that the experts who testified at trial and who had – and the many experts who had seen this defendant in the course of the institutional settings in which he was placed throughout his lifetime, the Court felt that those findings did not undermine the findings of those experts. Again, Your Honors, the district court found that essentially even assuming there was some ineffective assistance with respect to mitigation, the district court's ruling here was based on the prejudice prong, based first on – How do we test the prejudice issue? How much second-guessing do we get into here? I think, Your Honor, I mean, the question is, is it reasonably probable that it would have affected the verdict? What the district court found was that in addition to – well, what the district court found and used the language that the evidence presented on habeas was neither compelling nor extraordinary and to a large extent would have been cumulative of the evidence that was presented at the mitigation phase. Cumulative because it touched on the same subject except in exquisitely much greater depth? That it essentially gave this same background. Again, it found that there were good reasons not to present the mental health testimony. We still had a defendant who did not want family members testifying at the second trial. And for very good reason not to present them because they, for the most part, had criminal records of their own. They weren't going to be the best folks to put on there. And as the judgment that had been made at the first trial, which was to put on Mr. Walden, they didn't put on family witnesses at the first trial. And another factor with respect to the second trial is that there was new aggravation there to deal with at the second trial, which was he had received a death sentence at the first trial and in the meantime had picked up another number of violent incidents, including the stabbing of an inmate. Well, that came in anyway. Pardon me? Didn't that come into the penalty phase anyway? It did come in in the penalty phase. What I'm saying is, Your Honor, it was an even more difficult case. Well, you know, counsel, I really have trouble with that. You have Douglas where the guy committed one of the most heinous kind of crimes. And the Court says, if anything, that puts even more demand on defense counsel to be aggressive in investigating how you might convince a jury that this monster really has any redeeming virtue. And you're saying, well, look, this guy's a sociopath and it didn't work the first time, so you can come in with a much, as counsel argued, impressionistic view, sort of touching and skating along. None of the witnesses presented really dealt very directly with Stankiewicz personally. They sort of said, well, some people who go to prison find God and may be redeemable and all that's fine. But what about this man? The closest that comes in is the fellow who refers to the Napa. I mean, he sort of touches on it, Walden. But I thought we were addressing the prejudice problem, Your Honor. Well, I am. From the prejudice standpoint, yes. Well, you said it was cumulative. You say it's not the judge found it wasn't prejudicial because it was cumulative. Cumulative of what? And we're trying to assess on the prejudice problem. We're trying to assess is there any reasonable probability that there would have been any better outcome. You don't think, for example, that if the testimony, let's assume that the experts testified as they have proffered that they would. And the jury, having convicted them of this, which was clearly in some an impulsive appearing kind of act, without going into premeditation, it was an execution-style shooting, bang. Okay, now if the jury heard evidence that the guy has a mental defect that he's given because of fetal alcohol syndrome for bursts of violence, you don't think that that might have caused them to say, this guy did a very bad thing, but should he die for it? I don't think it would have altered it a bit, Your Honor. This is a guy with a substantial violent history. They'd already tried it one time. It hadn't worked. It was an even worse case. On that first trial issue, is there anything we can look to in terms of perhaps the cross-examination of those expert witnesses that would suggest that they might have they might collapse on cross in the second trial? And would that be relevant to the prejudice issue? I don't see anything in there that would cause them to step away or... I mean, the question is, would the district attorney have been able to put on, would the prosecutor have been able to put on solid expert testimony? It certainly may have been contradicted. I mean, there certainly may have been experts that would come in and testify otherwise. Your argument earlier, as I understand it, was that in the end, these witnesses stated that the defendant was a sociopath, notwithstanding any of these other either chemical issues or defect issues and that sort of thing. In the end, he was a sociopath. Does that trump any of the other evidence? I don't know that it trumps it, but the question is, did counsel make a reasonable tactical decision in choosing not to put on those mental experts at the second trial? That's the question under those circumstances. Of course, there's nothing to suggest this defendant didn't want them and hadn't cooperated with any experts, including at the second trial, and they'd had the same difficulty at the first trial. That essentially was what gave rise to the reversal of the first trial. And so there's also no reason to believe that he would have cooperated with any at the second trial. Remind me, it's in here, but remind me, what did Judge Ishii say when he ruled on this particular prejudice issue here for the mitigating? He said that there was good reason not to present the mental health testimony, that there was, that the experts, the new experts were not particularly credible, that they were not supported by the record, and that in any event the evidence put forth was neither compelling nor extraordinary and would have been cumulative. And I would point out, Your Honor, in terms of an evidentiary hearing, any idea of going back for an evidentiary hearing, this thing essentially, it's not clear to me what would be going back. The defense counsel is no longer competent to testify. Nell Riley, who was referred to by the petitioner, is a psychologist who did examinations that served, who did testing that served as the basis for testimony by other experts, is no longer competent to testify. And I'm not, at the point where Judge Ishii vacated his order on the evidentiary hearing, the scope of this matter had narrowed, and I go through an extensive hearing list of things that occurred between the time that Judge Ishii initially ordered evidentiary hearing on this small number of issues, and then there was a lot of evidence added to the record, expanded into the record. There were offers approved, a number of declarations. And the scope of this thing narrowed. Judge Ishii had made clear from the outset that he might limit witnesses based on offers approved. We went through this process. I would commend to the Court that extensive list of things that occurred between the time this hearing was ordered and when it was vacated. And when it was vacated, we were down to all it was that the Court was authorizing was depositions of some expert witnesses. So I'm not sure what we would be going back to if an evidentiary hearing were ordered. It's really difficult to sort out. What's the issue about the competence of trial counsel? The trial counsel, as I understand it, has Alzheimer's or will not ever be able to be competent to testify. Is that in the record here? It is in the record. Petitioners made clear as we were preparing for evidentiary hearing that he would not be available to testify. Counsel, in Wiggins, the Court noted that in Maryland that it was standard practice in death penalty cases to provide a social history of the defendant. Is that also true in California? I'm not aware of that, Your Honor. I don't know the answer to that. And in any event, I would say he had that social history based on the first trial. Who else testified at the first trial on the social history? Well, the mental experts make a number of references to his history, the point at which he was pulled out by. . . But we didn't have family members. We did not have. . . Do we have neighbors, teachers, social workers? They did not. At the first trial, they also did not present family witnesses. It was. . . I'm trying to recall if there was some social history. I mean, Mr. Walden was the same witness who testified at the second trial, testified and gave some social history. That was pretty limited, and he's missing about 13 years of history. It was limited. And, Your Honors, the experts refer to the fact that they have all these records of his, of the foster care, the juvenile history, the CYA history. The experts refer in their record of that first trial, they refer to specific doctor's reports. All that's in there. I think it's very clear that that was all available at the first trial. It was this counsel who obtained all the records of the trial counsel from the second trial and the appellate counsel. And, I mean, I think it's very clear that he had access to all of that. Counsel, would you. . . I don't want to deter Judge Scanlon and Judge Fischer if they want to pursue lines on this one, but I would like to ask about, at some point, about Officer Reed, about Officer Reed's testimony. Go ahead. Would you. . . Can you tell us why the government failed to disclose that Johnny Stankiewicz was in the car? I don't think that the government did fail to disclose it, Your Honor. This issue goes, I think, collides and collapses at its base, which is the assertion is that possibly someone other than the petitioner was the shooter in this case. And it's based on Johnny Stankiewicz giving an interview to the police after his arrest in which he attempts to blame. . . And there's some confusion and references in the record to what he's saying. But if you go back to the interview, if you go back to the base interview, which we included in our excerpt to the record, what he really does is attempt to blame Eddie Davis, who is the driver and who is murdered. He attempts to blame. . . And it is absolutely preposterous, the explanation. But the State doesn't deny. . . Does the State controvert that Eddie Stankiewicz was in the car? I'm sorry, that Johnny Stankiewicz was in the car. No, Your Honor. No. Johnny Stankiewicz. . . And that Officer Reed, either because he'd been hit or whatever, did not, did not, either didn't know or. . . But what the district court finds is he wasn't. . . That question wasn't asked. Now, it is. . . It seems that Stankiewicz's, Johnny Stankiewicz's testimony that Eddie was doing the shooting, the sort of, I'm driving with one hand while Doug got his foot on the gas and I'm shooting behind me through the window, is preposterous. But it suggests that Johnny Stankiewicz had very good reason for doing that, because Eddie wasn't the shooter, which meant that it was either Doug or it was Johnny himself. So, Eddie's dead. Johnny's got a very good reason for lying about this. The problem that I have with the way that the State presents this is that the State presents it as though there were two people in the car and Eddie's driving. And so by the process of elimination, Douglas must have been the shooter. And isn't the State at least obligated to admit that there was a third person in the car? There's no question that Doug's a bad guy. There's no question that he's participated in this. And he's beaten up on these people. He's stolen their car. He's reloading bullets. He's doing all kinds of things. But we don't know whether he's holding the gun or not. And that might be a fact. My recollection, Your Honor, is that the placement of the individuals in the car make clear that it was the person in the backseat that it was clear. Do we know that Johnny wasn't in the backseat? I think Johnny's own statement is that he is in the front passenger seat. We didn't believe him on who was shooting. I don't know why we'd have to believe him on where he was sitting in the car. Well, and, Your Honor, I'd have to go back and look at the exact interview. And the best I can say is my recollection of, I know Officer Reed made a statement in his testimony indicating that it seemed to identify the petitioner as the shooter. And the interview, I mean, unfortunately, that part of the record, it's been a while since I looked at it. But my recollection is that it's very clear that it could not have been Johnny and that there was no suggestion at any point that it was Johnny. I just can't at this point draw up the record well enough to point that out. But I think it's very clear from the record that it was not Johnny and that that was never the suggestion. Since Johnny has just come up in this inquiry, what about the argument about the conflict of interest that Goodwin had with respect to Johnny? First of all, all that was ever presented and supported, that was some suggestion from a family member that Mr. Goodwin may have represented Johnny on some grand theft matter. So it's very unclear what the matter was that was never developed. So first of all, it's not very clear that he ever represented him at all. Secondly, that it would have any tie to this case. And third and most important, it kind of comes back to this matter. The whole idea of the conflict and how it would have impacted here is the suggestion that somehow that would have interfered with Mr. Goodwin's desire to try to pawn this off on Johnny. And then they point to the interview. And the interview, Johnny is not saying it was him. He could have used the interview because the interview is not putting Johnny in jeopardy. It's blaming it on Eddie Davis. So it just that whole line just doesn't hold together. And I don't necessarily agree with the district court. Hold over Johnny at the time of the shooting? That he was in the car? I just, Tishner was 14, and I believe Johnny was a, within two years, but I can't recall older or younger. I can't recall. I believe younger, but I can't recall. I thought Johnny was older. I can't recall that for sure, Your Honor. Counsel, is there any evidence that Mr. Goodwin knew of the police report on Johnny? I'm sorry, Your Honor, could you repeat that? Did Mr. Goodwin know that the police knew that Johnny was in the car? He would have from the, it was in the first trial. In the first trial it was in the car. It was brought up in the first trial, yes. Counsel, your time has expired. Thank you. We'll hear from either Ms. Hart or Mr. Arrigo. I'm not sure who's going to, you have about three and a half minutes. We're going to be two minutes each, if we may. I'll go through this quickly. Four minutes to three and a half. We'll probably allow that. Go ahead. I think the easiest answer on the question of prejudice is that we have the fact here that in fact the jurors were split very close to the time of their final decision. This was, the jurors didn't see it as a cut and dried issue. Are you talking about the penalty phase? Correct. The second, the expert witness at the first trial explicitly said that if there had been heroin use, he would have found A, the lack of ability to premeditate. So their expert, the defense expert, in fact said had the facts been different, there would have been a different testimony from him. Third, between the two trials, the definition under DSM of a sociopath changed. Mr. Stankiewicz was no longer a sociopath within the meaning of DSM at the time of the second trial. I went into that in considerable detail in the motion for reconsideration after denial of the writ. Fourth, the lawyer from the first trial himself, Mr. Chandra, said that had he had the cooperation of his client, what he presented would have only been the starting point. It was by no means the end. Fifth, the attorney general stated that Walton's testimony at the two trials was essentially the same. That's not true. It was much stronger at the first trial. The reason was that defense counsel at the second trial gave him a sheet of paper to refresh his memory, and it was the wrong sheet of paper. He didn't prepare his own witness at all. If you want to share some time, I think you might let this heart come. Then I will only mention one other thing, which is that whatever you think of Johnny Stankiewicz's testimony, he explicitly said, Dougie couldn't shoot. Dougie tried to take the gun away from me to prevent me from shooting. That's in your brief, I think you better. Okay, thank you. Ms. Hart? The court did inquire whether there was anything in the record about Hugh Goodwin. Do you know, I don't think there is anything explicitly in the record about his medical condition. Mr. McLean said that he had Alzheimer's. I personally have seen him. I just report as an officer to the court. He's had some type of stroke. He has round-the-clock nursing care. He's in a wheelchair. But I think that because Judge Ishii knows who Hugh Goodwin is, that there was not anything put officially in the record, just to clarify that. And Johnny Stankiewicz was apparently 14 at the time. The main point I wanted to make is that irrespective of the first trial, Hugh Goodwin had an independent obligation as Mr. Stankiewicz's attorney, independently to investigate this case by his own declaration. He said he hired no investigator and hired no experts. So whether he made a call to an expert or whether he actually read the record, we don't really know whether he read the record of the experts. The point is he said he hired no experts, and therefore, we cannot make any assumption that he actually entertained his independent obligation to research the life history of Mr. Stankiewicz. Thank you. Thank you very much, Ms. Hart. The case just argued will be submitted for decision, and the Court will adjourn. All rise.
judges: O'scannlain, Fisher, Bybee